Rudolph John TOHAN

v.

JOSEPH T. RYERSON AND SON, Inc., a Delaware corporation, Defendant and Third Party Plaintiff,

Custodis Construction Co., Inc., a Delaware corporation, Third Party Defendant.

Norman WILSON

v.

JOSEPH T. RYERSON AND SON, Inc., a Delaware corporation, Defendant and Third Party Plaintiff,

Custodis Construction Co., Inc., a Delaware corporation, Third Party Defendant.

Civ. A. Nos. 21392, 21774.

United States District Court
E. D. Pennsylvania.
Sept. 30, 1958.

Thomas Z. Minehart, Philadelphia, Pa., for plaintiff.

Francis E. Marshall, Philadelphia, Pa., for defendant and third party plaintiff.

Victor L. Drexel, John B. Hannum, 3rd, Philadelphia, Pa., for third party defendant.

CLARY, District Judge.

Plaintiffs, Rudolph John Tohan and Norman Wilson, brought separate actions against defendant, Joseph T. Ryerson and Son, Inc., hereinafter called "Ryerson", for damages on account of injuries sustained by them through the alleged negligence of the defendant Ryerson. The cases were consolidated for trial and tried before the Court and a jury. Verdicts were rendered by the jury against defendant Ryerson in favor of plaintiffs, Tohan in the sum of $50,000 and Wilson in the sum of $10,000, with contribution on the part of Custodis Construction Co., Inc., hereinafter called "Custodis", employer of both plaintiffs, who had been brought in as a third party defendant at the request of Ryerson, defendant and third party plaintiff.

Viewing the evidence in a light most favorable to the plaintiffs as the

Court is required to do, Downey v. Union Paving Co., 3 Cir., 1949, 184 F.2d 481, the essential facts are as follows: Arthur Bailey, foreman of Custodis, went to the office of defendant Ryerson on the afternoon of August 20, 1956 for the purpose of buying 2 I beams, 26 foot long, which he intended to use to suspend a circular scaffold which would be used to install the inner-lining of a 200 foot high chimney, 23 feet in diameter, being constructed by Custodis in southwest Philadelphia for the Gulf Refining Company. The Ryerson receptionist asked a salesman, Mr. Robert Miller (then a college student and part-time employee) to handle his order.

Still viewing the evidence in the most favorable light to the plaintiffs with respect to the crucial point as to Bailey's statement of use to Miller and his reliance upon Miller's and Ryerson's special skill in furnishing a proper chattel, the evidence disclosed that Bailey asked Miller for 2 I beams; that he told Miller he needed the beams to lay across the top of the 23 foot chimney for the purpose of attaching the scaffold to them by U bolts; that the beams would suspend the weight of the jacks, hangers, cables, scaffold, three or four tubs of mortar; four or five tubs of brick, and three to five bricklayers. He then asked Miller "If they could furnish me anything that would take care of that". (N.T. 97) Significantly, although Bailey had a blueprint of the chimney in his pocket, he never bothered to exhibit it to Miller and never gave even an approximation of the weight in pounds or tons that the beams would be required to suspend. Miller made a check of his records and, after discovering that there were in stock 2–40 foot 8 inch light I beams, reported to Bailey that fact and stated they could be cut to the required length. Bailey replied that it would be all right to have them cut to the 26 foot length and delivered to the job, which subsequently they were. The testimony revealed that the beams had been manufactured by the Bethlehem Steel Company and were known in the structural steel business as an eight (8) inch light beam, eight (8) inch by four (4) inch, thirteen (13) pounds per foot. After delivery to the site the beams were inspected by Bailey and no complaint made of them. That was Ryerson's last connection with the case.

Later under Bailey's supervision the beams were raised and placed on top of the chimney in a position to suspend the scaffold. The materials for the hanging and operation of the scaffold, with the exception of the wooden platform on which the men worked, had theretofore been customarily obtained by plaintiffs' employer Custodis from a firm known as the Patent Scaffolding Company, a firm which specializes in supplying equipment for scaffolds. In this case Patent Scaffolding Company delivered on the site all of the material necessary to support and operate the scaffold, except the I beams and U bolts on which the scaffold was suspended from the beams at the top of the chimney. The method of erecting the scaffold was to place two steel I beams across the top of the chimney and suspend a wooden platform by steel cables almost the full length of the chimney in a manner so that the circular wooden platform would hang freely in the chimney without touching the sides. The wooden platform could thus be raised from time to time and yet be close enough to the sides of the chimney so that the men could reach the sides and lay brick thereon. The steel beams were laid across the top in an I or vertical position. Four wire cables were attached to the beams by means of the U bolts placed in such position on the beams as to enable the scaffold to be moved upward and downward. The U bolts in this case were specially manufactured for this job by another concern not connected with the case. The four cables were attached below to four winches or ratchets set on the platform with handles, and it was by means of these four winches that the four steel cables were caused to raise the platform from time to time as required by the work. The I beams after being raised and placed on the top of the chimney in upright or proper position were

not anchored to the sides of the chimney. The scaffold by the use of the specially made U bolts (also not anchored to the I beams) was attached to the cables and the scaffold put in operation. After it had been in use for a period of approximately two weeks and the work had progressed where the scaffold had been raised three or four times and was approximately 40 feet in the air, one of the I beams dislodged from its upright position causing it to turn to a horizontal position. The unanchored U bolts slipped toward the center exerting tremendous pressure at that point of the I beam, causing it to bend or go into a concave position, tilting the scaffold, and precipitating both plaintiffs to the ground causing the injuries complained of. The only testimony that it was not customary to anchor the I beams to the top of the chimney, not to anchor the U bolts, or not to cross brace the I beams, came from Bailey, who said he had never heard of any of these precautions being taken in constructing chimneys and his record experience in this regard was that he had worked on a dozen chimneys or more prior to the accident. The testimony of both plaintiffs' and defendant's experts was to the effect that had a simple cross bracing, wooden or metal, been used to brace the I beams, three to seven times as much weight could be safely borne by the beams than without bracing and, of course, such bracing would prevent tilting such as occurred in this case.

The testimony further clearly revealed that at no time, other than as set forth above, did Bailey inform Ryerson exactly what weight would be placed on the scaffold, what the method of construction of the scaffold would be, and what if any precautions would be taken to anchor U bolts to the beams or the I beams to the top of the chimney.

The jury by its verdicts determined that under these circumstances Ryerson was negligent in furnishing to Custodis a chattel unsuitable for the use to which it was to be applied. The plaintiffs have moved both for judgment n. o. v. and for a new trial.

## Discussion

In its motion for judgment n. o. v. Ryerson has asserted that the above outline of evidence failed to prove a breach of legal duty owed by the defendant to plaintiffs herein. It concedes, however, that if, from that evidence, negligence may be inferred, the jury's finding must be conclusive. Plaintiffs relied in great measure on Section 401 of the Restatement of Torts, which as supplemented in 1948 reads as follows:

"Section 401. Chattel Bought In Reliance Upon Vendor's Competence and Care.

"Chattel Likely To Be Dangerous

"A vendor of a chattel manufactured by a third person who has reason to know that the chattel is, or is likely to be, dangerous when used by a person to whom it is delivered or for whose use it is supplied, or to others whom the vendor should expect to share in, or be in the vicinity of its use, is subject to liability for bodily harm caused thereby to them."

Comment:

"a. *Reason to know*. The words 'reason to know', are defined in § 12 (1) and are used to denote the fact that the actor has information from which a person of reasonable intelligence or of the superior intelligence of the actor would infer that the fact in question exists or that such person would govern his conduct upon the assumption that such fact exists. The words 'reason to know' do not impose any duty to ascertain unknown facts, and are to be distinguished from the words 'should know' as defined in § 12(2)."

The Court, after a review of the entire case, agrees with the position taken by Ryerson that it had "no reason to know" that the beams would be used without Custodis taking simple precautions in their use to prevent harm to its employees. From all the evidence the conclusion is inescapable that the beams were suitable for the purpose for which

they were sold. They had functioned adequately for a period of two weeks and under circumstances wherein much greater stress and weight than at the time of the accident had been placed upon them. The sole proximate cause of the accident was the tilting of an unanchored beam and the sliding of the unanchored U bolts to the center of the beam when it was in a flat or horizontal position and unusual and extreme pressures were applied to the weakest point of the beam. It was the tilting of the beam to this improper position which caused the accident. The tilting was caused by the improper construction of the scaffold and the use of the beams by Bailey of Custodis. There was no obligation upon Ryerson to foresee that simple ordinary precautions would not be taken to keep the beams in proper position and to prevent the very thing that happened. The beam, as even plaintiffs admit, was of proper texture, that its size and weight was proper, and it was not defective in any way. The only claim is that it was inadequate for the purpose. The plaintiffs themselves by their testimony have established that properly used the beam was sufficiently strong to support the weight imposed upon it up to the time of the accident.

 Nor does the evidence of witness Bailey as to his lack of knowledge of anchoring and cross bracing establish a custom which would relieve him of the obligation to take reasonable precautions in the erection of a scaffold. As stated by Judge Learned Hand in the case of The T. J. Hooper, 2 Cir., 1932, 60 F.2d 737, 740, "There are precautions so imperative that even their universal disregard will not excuse their omission". A simple cross bracing or anchoring would have prevented the tilting of the beam from its upright position to a horizontal position wherein the strength of the beam was radically lessened. Section 401 of the Restatement of Torts does not impose the responsibility upon a vendor to anticipate an improper use of an otherwise adequate chattel. The negligence which caused the accident was that of

Custodis solely and not of Ryerson. Therefore, the verdict against Ryerson can not stand.

Defendant has also argued that even assuming negligence in the sale of these beams, the negligence of Custodis was an intervening and superseding cause of the injuries sustained in this accident. From what has been said before, such assumption cannot be made and, therefore, there is no need for an extended discussion of this ground. Without elaborating, it is the opinion of this Court that under the rule of Kline v. Moyer and Albert, 1937, 325 Pa. 357, 191 A. 43, 111 A.L.R. 406, opinion by Justice Stern, later Chief Justice, as implemented by Roadman v. Bellone, 1954, 379 Pa. 483, 108 A.2d 754; see also Humphrey v. Lovejoy, 3 Cir., 1957, 250 F.2d 879; Listino v. Union Paving Co., 1956, 386 Pa. 32, 124 A.2d 83, and DeLuca v. Manchester Laundry and Dry Cleaning Co., Inc., 1955, 380 Pa. 484, 112 A.2d 372; considered in the light of the facts of this case, the evidence is not sufficiently clear to warrant (under an assumption of negligence) the declaration as a matter of law that the action of Custodis was a superseding cause.

 Finally, defendant has moved in the alternative for a new trial. Heeding the admonition of the Court of Appeals for the Third Circuit in Green v. Reading Co., 1950, 180 F.2d 149, that where motions are presented for a new trial and for judgment, the trial judge should rule on the motion for judgment; and whatever his ruling thereon, he should also rule on the motion for new trial indicating the grounds of his decision.

It was developed after trial that the key witness for the plaintiffs (Bailey) had shortly after the accident given a written statement substantially at variance with his sworn testimony at time of trial. The verdict in favor of plaintiff Wilson was definitely excessive and showed lack of consideration on the part of the jury. There was an incorrect reference in the charge of the Court with respect to the liability of Custodis for contribution which, although later corrected,

might well have intended to confuse the jury.

Taking into consideration the entire record, including but not limiting its consideration to the above factors, the Court is definitely of the opinion that the interests of justice in any event require a new trial. Under the circumstances an order will be entered granting defendant Ryerson's motion for a new trial, in the event that on appeal the action of the Court in granting judgment in favor of Ryerson should be set aside.